Paul L. HEINEMAN, Appellant,

v.

Lou A. Charno HEINEMAN,
Respondent.

No. WD 39706.

Missouri Court of Appeals,
Western District.

Jan. 31, 1989.

Motion for Rehearing and/or Transfer to
Supreme Court Denied March 28, 1989.

Application to Transfer Denied
May 16, 1989.

Howard E. Bodney, Overland Park, Kan., for appellant.

Darrell L. Havener, Richard W. Miller, James B. Betterman, Kansas City, for respondent.

Before KENNEDY, C.J., and MANFORD and BERREY, JJ.

KENNEDY, Chief Judge.

Husband Paul L. Heineman and wife Lou A. Charno Heineman both appeal from a "final decree regarding property and other issues" dated June 23, 1987. The decretal provisions in dispute relate to maintenance to be paid by husband to wife; allocation of marital and nonmarital property; wife's alleged breach of antenuptial agreement in making excess gifts to her children; and wife's attorney's fees to be paid by husband.

An earlier decree, dated December 30, 1986, dissolved the marriage of the parties and no appeal has been taken therefrom.

Husband also appeals an order dated December 30, 1986, allowing to wife attorney's fees pendente lite of $56,578.50 and expenses pendente lite of $5,000.

The parties were married June 8, 1979. Husband was a top-level partner in a large engineering firm. Wife was an eminent portrait photographer and the proprietor of a photographic studio. Each had been married before and each had children by a previous marriage or by previous marriages. One of wife's children, a daughter 16 years old at the time of the marriage, is spoken of as living in the household for some or all of the time of the marriage.

The parties were separated June 2, 1983, after approximately four years' marriage. The dissolution case was filed by husband on June 3, 1983.

Before their marriage the parties had entered into an antenuptial agreement which they agree is valid and binding.[1] The agreement purported to list all the property each of them owned. It provided that in the event of a divorce, each was to retain the property owned by himself or herself at the time of the marriage. Marital property would be divided equally between them. The agreement contemplated that the couple would initially live in a residence belonging to the wife. (In fact they continued to live in wife's residence during the entire time they lived together.) Each of them would contribute to the payment of household expenses. Wife waived any maintenance, support or alimony in case of divorce, except as to one-half the amount by which husband's E & U ("earned and uncollected") account with Howard Needles Tammen & Bergendoff ("HNTB") should increase during the marriage of the parties. HNTB was the engineering firm in which husband was a partner.

Wife's property listed on a schedule attached to the agreement totaled $425,732 in value, net of a "reconstruction loan" of $37,000. Not included in the list of assets was wife's photographic studio, a sole proprietorship, although it was mentioned and specifically provided for in the agreement. A studio balance sheet attached to the agreement shows it to have had a negative net worth of $3,912.25.

1. *See Nedblake v. Nedblake,* 682 S.W.2d 852, 854 (Mo.App.1984); *Ferry v. Ferry,* 586 S.W.2d 782, 785–86 (Mo.App.1979).

Husband's list showed assets of $1,883,516 and liabilities of $349,900. The liabilities included: "Alimony payments in future per court order", $307,450. The assets included at a valuation of $1,537,250 an item called "E & U" under the head "HNTB accounts".

We will notice pertinent parts of the agreement more closely as we take up the specific items in the decree appealed from.

The first matter of dispute between the parties is the court's award of maintenance to the wife. The court's aim and purpose in the award of maintenance was to implement the antenuptial agreement with respect thereto. That approach is approved by both parties, but each, in different particulars, contends that the court has failed to follow the terms of the agreement.

The antenuptial agreement provides:

In the event of a divorce ... (t)o the extent that the E & U account has increased if any, at such time, as compared to its amount at the time of the execution of this Agreement, Paul agrees to pay support payments to Lou in an amount equal to one-half of such increase; said payments will be payable over the remaining life of the E & U Account if said life is not less than three years, but otherwise such amount will be paid over a period of three years.

The antenuptial agreement describes the E & U account in the following terms:

At the present time Paul is a partner in the engineering firm of Howard Needles Tammen and Bergendoff. Under the provisions of the partnership agreement of that firm (as said partnership agreements are modified annually), it is presently provided that an account is set up on the books of the partnership which refers to the earned and uncollected profits of certain contracts executed and performed by the partnership, in whole or in part, during the years in which each of the various partners were active partners in such firm. It is recognized that by subsequent amendment of the partnership agreement, that account may be abolished in its entirety or may be substantially modified or reduced. It is further recognized that, even without the modification of the partnership agreements, no partner has a vested interest in such account until he retires or dies as an active or retired partner and until he actually receives in cash the amount of earned and uncollected profits referred to on said account. It is recognized that the figure which appears on said account is merely an estimate and is subject to material revision depending on the profitability of various contracts and further that in any given year the partnership may withhold up to 25% of the annual amount owing to any retired partner or the estate of a deceased partner on account of such payments. For all of these reasons, it is agreed by the parties that said account, and the amounts of money referred on said account, do not constitute any kind of property whatsoever for this Agreement except and unless and until: (a) the amount of such account as reflected on the records of said partnership shall increase over and above the figure as reflected on the attached Exhibit A which is computed as of April 28, 1979, and the amount of such increase shall be treated as hereinafter set out; and (b) until such account results in actual cash being received by Paul after retirement or by his estate after his death, which such cash upon receipt during the marriage shall be considered to be and shall become marital property ...

In the section dealing with the consequences of a divorce, the antenuptial agreement goes ahead to say:

It is recognized that the E & U Account is only payable (without interest) over a period of ten years after death or retirement of a partner, and is unfunded and payable only out of the earnings of the said partnership. Any support payments to be made to Lou in an amount tied to the amount of the increase of such account would only be payable to her as and when same would be otherwise distributable to Paul by the partnership ...

The antenuptial agreement valued the E and U account as of April 28, 1979, at

$1,537,250. The court fixed the closing date for valuation of the account as December 31, 1984. At that time the E and U account had grown to $2,566,534.62, an increase of $1,029,284.62 over the antenuptial agreement valuation.

■ The cutoff date of December 31, 1984, presents the first bone of contention. Wife in her appeal contends that the cutoff date should be December 30, 1986, the date of the decree dissolving the marriage, by which time the E and U account had grown to $3,576,426.70. She bases her argument upon the language of the antenuptial agreement which is that "in the event of a divorce", wife will receive support payments "to the extent that the E & U account has increased if any at such time".

During the course of the lengthy, intermittent trial the court on November 20, 1984, ordered that the ending valuation date would be December 31, 1984, a date urged by wife. At the time, the designation of December 31, 1984, appeared advantageous to the wife. The husband was contending for a December 31, 1983 ending date. (The account normally was valued only on December 31 of each year.) The parties had been separated since June 2, 1983, and the dissolution case had been pending since June 3, 1983. By fixing this cutoff date at which the E and U account would be valued, neither party could gain or lose by attempting to hasten or to delay the dissolution decree. The E and U account might increase or decrease during an extended time, so that either party could gain or lose by the fixing of the cutoff date. Neither party was denying the irretrievable breakdown of the marriage, so that part of the decree was uncontested and routine. It is true that the actual dissolution of the marriage was delayed for two years from the ending date of December 31, 1984, far longer than either party contemplated at the time the ending date was fixed, but we hold that the wife is estopped to complain of the court's fixing a cutoff date urged by her. *Vorhof v. Vorhof*, 532 S.W.2d 830, 832 (Mo.App.1975); *Medlicott v. Medlicott*, 617 S.W.2d 576, 580 (Mo.App.1981).

Wife's contention for a December 30, 1986 ending date is therefore rejected.

We turn to husband's challenges to the support provisions of the decree.

The dissolution of the marriage was decreed, as noted above, on December 30, 1986. On December 31, 1986, husband retired. At that time the E and U account became vested, subject to annual adjustments in the account and subject to the sufficiency of HNTB's profits for payment. Husband at that time became entitled to the payment of the amount of his share in the E and U account over a term of 10 years, if the earnings of HNTB were sufficient to pay the same. At the time of the June 23, 1987, final decree, husband had received five monthly payments totalling $118,121.91. These were described on the respective checks as "advances" or "credits" against the E and U account.

The court's judgment ordered in effect (omitting certain refinements) that wife should receive a percentage of husband's E and U cash payments in the ratio which the April 28, 1979–to–December 31, 1984 increase in the E and U account bore to the total of the account on December 31, 1984. This resulted in a ratio of 40.104%, one-half of which, or 20.052%, would be payable to the wife. At the time of the June 23, 1987 decree husband was receiving payments from his E and U account based upon the December 31, 1985 balance. (The 1985 year end balance was the most recent year end balance which had been established, and the payments were based on that balance and not the December 31, 1986 balance. The latter balance had not yet been established.) The decree provided for recomputation of the percentage after the year end 1986 adjustments to the account were made. The decree ordered also that, should husband be required to refund to HNTB any part of the cash payments from the E and U account to him, the wife also should repay ratably.

■ Husband does not attack the court's formula or its calculations (except for the beginning valuation, which we deal with later), tacitly conceding that the court has read the antenuptial agreement correctly.

Husband does, however, attack the whole concept of wife's sharing in the advance payments, or the interest free loans, by which husband is being paid. Husband would like the wife to be postponed in the receipt of any payments from the E and U account until husband's account with HNTB is settled and fixed year by year and subject to no further adjustments.

For this position, husband cites the well-known proposition that: "A decree is indefinite, uncertain and unenforceable if the amount of the judgment cannot be ascertained without resort to external proof beyond the record or another hearing", citing *Loveland v. Henry,* 700 S.W.2d 846, 849 (Mo.App.1985); *Ravenscroft v. Ravenscroft,* 585 S.W.2d 270, 273 (Mo.App.1979); and *Morovitz v. Morovitz,* 693 S.W.2d 189, 190 (Mo.App.1985).

This principle is not applicable to the kind of case we have before us. It is frequently necessary in the disposition of retirement benefits in dissolution cases for future calculations and recomputations to be made. This has proved to be no impediment. *See Kuchta v. Kuchta,* 636 S.W.2d 663 (Mo. banc 1982); *Alvino v. Alvino,* 659 S.W.2d 266, 271–72 (Mo.App.1983); *Lynch v. Lynch,* 665 S.W.2d 20, 23 (Mo.App.1983); *Hagerman v. Hagerman,* 682 S.W.2d 28, 30 (Mo.App.1984).

Husband's payments from the E and U account began in January, 1987, after his retirement on December 31, 1986. HNTB's practice was to pay out the balance in the E and U account to a retiree such as husband over a 10–year period, at the rate of 10 percent per year. The amount of husband's entitlement for 1987 would be calculated at the end of 1987, although the year end computations were not completed for some months after that date. During 1987 husband would receive equal monthly payments as "interest free loans" or as "advances" against his entitlement for 1987. The amounts of these monthly advances— until the 1987 year's end E and U account balance was computed—were based upon the most recent year for which the E and U account balances had been established. When the amount of husband's entitlement

was settled after the end of 1987, he would be entitled to any balance owing to him, or would be called upon to repay any overpayment. Any overpayment might be withheld from future payments. As a matter of fact, there had never in the 24–year history of the E and U account been an overpayment. HNTB had in at least one year during that time foreseen a shortfall and had withheld monthly advances for a period of five months.

For years subsequent to 1987, the procedure would be repeated. In the second year, the balance of the account would be payable in the remaining nine years. In the third year, the remaining balance would be payable in the remaining eight years, and so on.

The trial court was within his discretion in ruling that wife should receive her portions of husband's E and U advances when received by him, even though the right to retain them would not be settled till computations of partnership, profits and E and U balances were completed as of the year's end. The likelihood of overpayments by way of advances (which would have to be repaid by husband and wife) is slight. Since the beginning of the E and U account in 1963, it has never happened. HNTB has ways to protect itself against overpayment including (as happened one year for five months) the withholding of advances. Any repayments may be collected from future E and U payments owing to retiree. It is permissible, and perhaps better, to place wife upon the same footing as husband with respect to the time and manner of payments.

█ Husband must be sustained, however, in his claim that wife is not entitled to judgment for a specific sum of money.

The decree purports to give to wife judgment for "the aggregate amount of $514,-642.31, said amount being 50 percent of $1,029,284.62, which is the increase in Petitioner's E and U account between April 28, 1979 and December 31, 1984". Wife is not entitled to a specific sum of money. She is entitled to a percentage of the amount received by husband from the E and U account, and that amount cannot be known in

advance. The formula may entitle wife to more or less than the specific amount by which the E and U account grew during the marriage. Upon remand, the court is directed to eliminate from the decree the language which gives wife judgment against the husband for maintenance in a specific sum of money.

■ Husband makes one argument against the formula used by the court. His argument is that there is no beginning valuation of husband's E and U account established by the evidence. Husband is wrong on this point. The beginning valuation of $1,537,250 was specifically shown in an exhibit entitled "Paul L. Heineman's Summary of Assets and Liabilities" attached to the antenuptial agreement. The date of its valuation is shown in said exhibit as "4–28–79", forty days before the signing of the agreement, but the language of the antenuptial agreement is too clear for argument that it was that figure which was intended by the parties to be the beginning figure.

■ Husband then says that wife was entitled to no support or maintenance at all because the December 30, 1986 decree, which dissolved the marriage said "that neither party should have alimony or maintenance, one from the other". This provision, says the husband, makes the matter of maintenance *res judicata*. Husband's position is untenable. The December 30, 1986, decree makes it clear that wife is not entitled to statutory maintenance, i.e., that based upon the spousal relationship, Sec. 452.335, RSMo Supp.1988, but that she is entitled in lieu thereof to a share in the E & U account under the provisions of the antenuptial agreement. The December 30, 1986, decree deferred to a later time a decision upon the support to which wife was entitled under the antenuptial agreement and the E & U account.

Husband complains of the court's disposition of several items of money and property between himself and wife.

The antenuptial agreement in Section 9 thereof makes the following provision for the distribution of property upon dissolution:

All property owned by either party prior to the marriage as listed on Exhibits A and B will be treated as separate property and allocated to the party who owned the said property; if there is any increase in value of any of said property (except the E & U account as hereinafter provided), such increase shall belong to the party who owned said property; if any of said property has been sold during the marriage and the proceeds are identifiable or traceable, such proceeds shall be allocated to the party who owned said property; ...

(d) All other collective property as herein defined shall be considered Marital Property; said Marital Property shall be divided equally between Lou and Paul ...

An earlier paragraph in the antenuptial agreement defines the term "collective property" as "all property and assets which are owned by each of the parties at the date of the execution of this Agreement and all property and assets hereafter acquired by the properties (sic)".

The largest item in dispute between the parties is the retained earnings account of the wife's studio corporation. This amounted to $128,063. The court held it was nonmarital property of the wife and awarded it wholly to her.

Husband challenges its award to wife, claiming it was marital property. He argues also that the court erred in finding that the retained earnings account was only $128,063, that it should have found it was $240,059.32.

Taking up first the amount of the account: There was evidence of the larger figure contended for by husband, but the court adopted the smaller figure as shown on the corporation tax return for the fiscal year ending September 30, 1984. It seems that the evidence should have explained the discrepancy, but it did not do so. We are unable to say the court was in error on this point, and we reject the husband's contention that the retained earnings account was greater than the figure shown on the tax return.

We hold, however, that the court erred in its finding that the retained earnings account represented only an "increase in value" of the studio, in which, under the terms of the antenuptial agreement, the husband was not entitled to share.

At the time of the marriage the studio was not a separate entity but was operated as the wife's sole proprietorship. As shown above, the studio balance sheet showed a net worth of minus $3,912.25.

The corporation was formed later during the marriage, and the studio began operating in corporate form on October 1, 1981. At husband's instigation, and with wife's agreement, wife, as an income tax saving stratagem, took no salary from the corporation. The salary she would have taken was retained in the corporation and by September 30, 1984, the retained earnings as earlier noted had accumulated to the sum of $128,063.

The trial court held that the retained earnings of the corporation represented an increase in value of the studio. As an increase in the value of premarital property the retained earnings account was, according to the court's finding, nonmarital property.

We hold however that the retained earnings did not represent an increase in value of the premarital studio. The corporation did not exist at the time of the marriage, it came into being after the marriage. The retained earnings account was accumulated from money which otherwise would have been paid to wife as her salary. If the business had remained unincorporated all the profits thereof would have constituted earnings to the wife and would have constituted marital property.

The case of *Hoffmann v. Hoffmann*, 676 S.W.2d 817, 825–26 (Mo. banc 1984), supports our holding that the retained earnings account was marital property. *Hoffmann* dealt with the statutory definition of marital property rather than the interpretation of an antenuptial agreement, but the concept of marital property under the statute and the concept of marital property under this antenuptial agreement are very close to each other. Sec. 452.330.2, RSMo

Supp.1988, provides to the same effect as this antenuptial agreement, that "increase in value of property acquired prior to the marriage" is excepted from marital property. In *Hoffmann* the wife contended that the enhancement in value during the marriage of the husband's premarital stock in the family corporation, of which he had been a major stockholder and chief executive officer, was marital property. Wrote the court:

> While this is a legitimate theory to pursue, it does not redound to her benefit in this case. The wife has failed by any proof to establish the value of the husband's services to the corporation or that he had indeed sacrificed payment of marital funds, by way of salary or dividends, in order to increase the value of the corporation's stock. It would require substantial speculation to conclude that the stock's value had appreciated in any amount due to the husband's forsaking marital property compensation for his services.... None of (the) evidence would justify a finding that the husband was inadequately compensated for his working efforts during the corporation's growth. Hence, the trial court's judgment that marital property was not used to increase the corporation's value was properly supported by credible evidence
> ...

We have the exact reverse of *Hoffmann* in the case before us. Here it is clear that the wife, the sole stockholder of the corporation, for some period of time forewent all compensation for her services, which would have been marital property, and that the retained earnings account of the corporation is directly traceable to that forbearance. It is clear, too, that the earnings of the corporation were attributable in only a minor way to the capital of the corporation. Chiefly the earnings were from wife's valuable services. We hold, then, that the retained earnings account in the amount of $128,063 is marital property. It has no bearing upon this result that the husband agreed to this plan or even that he instigated it.

■ The court denied to husband a claim for one-half of $40,000 of marital funds which were expended during the marriage of the parties on wife's house, which was the marital residence of the parties. For his position he cites *Townsend v. Townsend,* 705 S.W.2d 595, 597 (Mo.App.1986); *Ravenscroft v. Ravenscroft,* 585 S.W.2d 270, 272 (Mo.App.1979); and *Daniels v. Daniels,* 557 S.W.2d 702, 705 (Mo.App. 1977).

Husband's evidence, however, does not bring his claim within the holding of those cases.

There was in the first place no evidence how much, if any, the claimed expenditures increased the value of the house.

Second, the amount of husband's funds, or of marital funds, actually spent on the house, is left to speculation. The improvements included: refinishing some floors; installation of sprinkler system in yard, and subsequent extension of sprinkler system; major plumbing improvements; major wiring improvements; removal of deck; replacement of roof on house; total new roof on garage and storage area, and new siding on house. Husband described these projects as "betterments" as opposed to repairs, but adopted the court's term of "capital improvements". These characterizations were conclusory on husband's part. Husband was asked if he had a "general estimate" of the amount of money so expended. He answered: "My estimate would be in a range of $40,000". There was apparently an intention to return to the subject the next week for "specific numbers", but the subject was not taken up again.

On cross-examination, husband testified that the new roof was traded for "some portraits". There was no evidence whether the portraits were marital property. Husband testified also that the house siding was paid for out of studio funds after the separation of the parties. It is not clear whether the "studio funds" were marital property. In dealing with other purchases, e.g., Chi Chi Mu tables and oriental rugs, dealt with elsewhere in this opinion, studio funds were considered by the parties as wife's nonmarital property. (Some of the "studio funds" were the product of loans from Paul Heineman to the studio. The unpaid balance of these loans at the time of the decree was $99,414, one-half of which, or $49,707, was ordered paid to husband. Neither party objects to this on this appeal.)

We may not upon this record convict the trial court of error in awarding to husband no reimbursement for funds spent on improvements upon wife's nonmarital residence.

■ We come next to a leased BMW automobile which was in the possession of wife at the time of the separation of the parties, but which was afterwards repossessed by the lessor of the automobile. At the time of its repossession by the lessor it had a value of $21,000, and the court, upon a finding that the husband had made wife a gift of the automobile, set over to the wife the $21,000 value of the automobile.

The history of the BMW automobile is as follows: Husband had a Toronado automobile under a lease from Gelco. The term of the lease was drawing near its end, when husband could purchase the Toronado from Gelco for $1.00. Wife at the time was driving a high mileage station wagon. Husband proposed that wife should have a new automobile. They looked at several automobiles and settled upon a new BMW. In February, 1983, before the separation of the parties on June 2, the wife's station wagon was traded in at a valuation of $2,000, and husband negotiated a lease of the BMW with Gelco. Gelco was the legal title holder of the automobile. Husband was the lessee and made the lease payments. The wife was the principal driver of the automobile while husband usually drove the Toronado automobile.

Husband paid one month's rental after the parties' separation and did not pay any more. Wife continued to use the BMW, but on March 1, 1984, the lessor repossessed it and sold it. Husband paid a deficiency of $3,300 after the lessor had sold the car.

Wife for her claim that the BMW was a gift to her depends upon the following testimony: Husband in February 1983 told wife he wanted to look for "a new car for you". Later as husband and wife were discussing with BMW salesman Parker the purchase of an automobile, they had under consideration a used BMW. Husband said to Parker, "If I am going to get Lou a car I want her to have a new one ... no, I want Lou to have a new car and I'm going to buy the new car." In Parker's hearing, husband said to wife, "No, Lou, if I am going to buy you a car I don't want you to get a demonstrator, I want you to get a new one".

■ One spouse may make a gift to the other, of course, from marital property or from nonmarital property of the donor spouse, although it requires clear and convincing evidence to establish such gift, *Townsend v. Townsend,* 705 S.W.2d 595, 598 (Mo.App.1986).

■ There was no evidence of any completed gift of the automobile by husband to wife. If his statements indicated an intention to make a gift of the automobile to be purchased, the intention to make a gift in the future is no gift. A gift is shown by a transfer of title and possession to the donee, including the relinquishment by the donor of all ownership and control. *Smith v. Smith,* 192 S.W.2d 691, 698 (Mo.App.1946); *Kidd v. Kidd,* 216 S.W.2d 942, 944–45 (Mo.App.1949); *Maus v. Rudloff,* 197 S.W.2d 980, 983 (Mo.App.1946). Transfer of ownership of a motor vehicle can be accomplished only by transfer of a certificate of ownership in accordance with statute, Sec. 301.210, RSMo 1986; *Horton v. State Farm Fire & Cas. Co.,* 550 S.W.2d 806, 809 (Mo.App.1977); *Bonnell v. Mahaffey,* 493 S.W.2d 688, 691 (Mo.App.1973); *Bordman Investment Co. v. Peoples Bank of Kansas City,* 320 S.W.2d 72, 77–78 (Mo.App.1958).

The award to wife of $21,000 as nonmarital property is error.

■ In 1981 wife contracted to sell the stock in the studio corporation for $135,-000. As security for buyer's performance,

to be forfeited as liquidated damages if buyer failed to complete the purchase, she took eleven paintings of a value of $13,400. The buyer was unable to complete the sale and wife became the owner of the paintings. The court held the paintings to be wife's nonmarital property. In this the court was in error. The paintings were "property acquired ... subsequent to the marriage", Section 452.330.2, RSMo Supp. 1988.

■ It is difficult to categorize this kind of income as it relates to the corporate stock contracted to be sold. For our purposes it is akin to dividends, rentals or interest from nonmarital property, which is held to be marital property. *Wilhelm v. Wilhelm,* 688 S.W.2d 381 (Mo.App.1985). It is also similar to damage awards received for personal injuries, which are held to be marital property. *Nixon v. Nixon,* 525 S.W.2d 835, 839 (Mo.App.1975); *Trapani v. Trapani,* 684 S.W.2d 500, 503 (Mo. App.1984); *Gonzalez v. Gonzalez,* 689 S.W. 2d 383, 384–86 (Mo.App.1985).

■ The court awarded to wife as her nonmarital property a library of glass photographic plates. Husband claims the court erred in doing so—that the plates should have been designated as marital property. He does not deny they were a part of wife's premarital studio property. His claim is based upon a licensing agreement husband and wife executed which granted to the studio corporation a license for the use of the plates for a royalty of 15 percent on any amount received from prints made therefrom. The licensing agreement was executed in connection with the wife's sale of the stock of the studio corporation referred to earlier, which sale was never completed. The license agreement was never observed as between the studio and the licensors. Husband does not develop how the plates passed from wife's ownership as nonmarital property into marital property status. He points simply to his joining his wife in signing the licensing agreements. The court ruled properly in holding that the photographic plates were nonmarital property of the wife.

Husband claims that the court erred in finding that a certain necklace of 90 pearls, valued at $8,000 (although purchased for considerably less than that amount) was the nonmarital property of wife. Husband's claim of error is denied. While the necklace was paid for from marital funds by a check written by the wife, she testified it was a birthday and Christmas gift from husband. Husband denies the pearls were a gift from him but there is substantial evidence in wife's testimony to support the trial court's finding on this point. *McDowell v. McDowell*, 670 S.W.2d 518 (Mo.App.1984).

The trial court did not err in awarding the wife as nonmarital property a pair of Chi Chi Mu tables for which she had paid $8,770. Wife purchased the tables and gave for them three post-dated checks, payable in successive months, on the marital bank account. She then transferred from her studio account funds to pay—or in the case of the first of the checks, to reimburse—the marital account. The parties do not dispute that the studio funds were wife's nonmarital property. This evidence supports the trial court's ruling that the Chi Chi Mu tables were wife's separate nonmarital property.

The trial court did not err, as husband claims, in awarding to wife as her nonmarital property eight of her photographic portraits of the value of $48,200, which at the time of the trial were on loan to the Riverside Museum and School of Photography. Husband argues that wife had given him a one-half interest in the portraits in order that their value might be deducted on income tax returns when they were later, after a decent time had passed, given as a gift to the Riverside Museum and School of Photography. There is no evidence that the portraits were ever given to the museum and the school, although they had been lent to that institution. Husband points out that wife gave no testimony on this point, but the absence of contradiction did not bind the court to accept husband's testimony. Husband's testimony of a completed gift from his wife to

himself of a one-half interest in these portraits is quite nebulous. The trial court was not required to believe his testimony, nor to place upon it the construction which is urged upon us.

Husband's next complaint is that the court did not assign the wife any share of husband's share of HNTB liabilities. While it is proper for marital liabilities to be allocated as between husband and wife,[2] still the court was correct in omitting any reference to husband's share in HNTB liabilities in this case. The only evidence of these liabilities was contained in the Schedule K–1 to IRS Form 1065 (the Partnership Income Tax informational return) as: "Partner's share of liabilities". For December 31, 1984, this figure was shown as $522,535.30. For December 31, 1978, the figure was $52,386.84.

That is the sum total of evidence on that point.

It was clear from the antenuptial agreement that husband's interest in HNTB—except for the E and U account—was husband's preserve from which wife was excluded. No attempt was made at the trial to show the increase or the decrease in the value of husband's interest in the partnership's assets, which might have increased by much more than his liabilities. On this record, the court did not err in declining to make wife an obligor on the partnership liabilities.

Husband says the court erred in failing to set over to him as his nonmarital property four oriental rugs owned by him at the time of the marriage and listed in the antenuptial agreement.

Husband claims that three rugs in the possession of the wife, and one in his own possession, a Kurd, were the four listed in the antenuptial agreement. The court set over to wife as her nonmarital property the three rugs in her possession, and awarded her $4,500 for the fourth rug, the Kurd, in husband's possession. There was evidence from which the court could believe that all four of the rugs in question

---

**2.** *See Costley v. Costley*, 717 S.W.2d 540, 543–544 (Mo.App.1986).

were purchased by wife with the studio funds and that they were not the rugs owned by husband before the marriage and listed in the antenuptial agreement. We are unable to convict the trial court of error in awarding to wife the three antique oriental rugs in her possession, and in awarding wife $4,500 from the marital funds for the Kurd in husband's possession.

■ A membership in the Rockhill Tennis Club was listed in the antenuptial agreement as husband's nonmarital property at a valuation of $2,500. The membership was purchased in 1979 before the parties' marriage. The parties' 1979 tax return lists the $2,500 membership fee as a deduction on the income and expense schedule of the studio (then an unincorporated proprietorship). The deduction was disallowed by the IRS upon audit. There was no other testimony about it. The antenuptial agreement controls on this item; the membership should have been awarded to husband as his nonmarital property, and the court erred in awarding it to the wife.

The court treated as marital property the sum of $19,890.63 which the court found had been added to an IRA account from husband's marital earnings, and awarded to wife half of such sum, or $9,945.32.

Wife claims there are three accounts instead of one, with a total of $80,384.36—grown to that sum, she says, from an antenuptial agreement figure of $8,000. She says the court should have deducted the antenuptial agreement value of $8,000 from the final figure of $80,324.36, and should have divided the balance of $72,384.36 equally between the parties. This approach would entitle her to $36,192.12.

We hold, however, that there was sufficient evidence to support the court's finding that there was only one IRA account, and that husband had contributed to it marital funds of $19,890.63. The award to wife of one-half of that amount, or $9,945.32, was supported by the evidence.

■ Husband next complains that wife's children by previous marriages received more by way of gifts than did his children. The antenuptial agreement contemplates that each of the four children of wife and the three children of husband were to be treated equally in testamentary dispositions and in inter vivos gifts. This requirement of equal treatment applied without respect to which of the parties made the gifts, to whose children, or whose property.

Husband presented a list of items which he claims were given by wife to her daughters, with a value from $16,400 to $40,050. Whether these gifts were made from wife's own property or from marital property the record does not show. If they were from marital property, they would have reduced the marital estate. If wife did make such gifts, they were in violation of the antenuptial agreement. Had she made such gifts to his children instead of her own, she would likewise have been in violation of the contract.

Assuming that the gifts were in violation of the agreement, as husband claims, the remedy requested by husband, i.e., that he should receive an amount equal to the amount of these excess gifts, is not appropriate. Exactly what his remedy might be, if any, we do not speculate.

■ An order for payment of attorney's fees and litigation expenses pendente lite is the subject of a separate appeal which has been consolidated with the appeal of the final order, which final order also ordered payment of husband of attorney's fees and litigation expenses. Wife's attorney's fees and litigation expenses in the pendente lite order and in the final order totaled $158,224.36. This sum included attorney's fees, $127,150.25 and attorney's expenses $11,461.58; accountant's fees $11,106.87; and special master's fees of $8,506.66.

Husband's attack upon these orders is that wife's counsel "failed to adduce evidence as to the amount and reasonableness of the attorney's fees and accountant's fees"; and that "respondent failed to adduce any evidence as to the amount, necessity or reasonableness of the fees charged by her counsel and expenses incurred by him on her behalf".

As husband develops his argument, his principal complaint is that computer print-

outs detailing legal services rendered, time involved and charges made were not formally offered and received into evidence. The record indicates they were before the court and in the hands of husband's counsel.

The only case cited by husband for his position is *In re Marriage of Vanet,* 544 S.W.2d 236, 244 (Mo.App.1976). In that case the court criticized the laxity of the manner of establishing attorney's fees in that case, but approved the trial court's award of attorney's fees on the ground that trial courts are themselves expert in the necessity, reasonableness and value of attorney's services, and may award attorney's fees without evidence. Other cases agreeing with *Vanet* are *Mills v. Mills,* 663 S.W.2d 369, 374 (Mo.App.1983); *In re Marriage of Dillon,* 559 S.W.2d 81, 83–4 (Mo. App.1977); *In re Marriage of Brewer,* 592 S.W.2d 529, 536 (Mo.App.1979); *Hankey v. Hankey,* 623 S.W.2d 35, 38 (Mo.App.1981); *Schreier v. Schreier,* 625 S.W.2d 644, 650 (Mo.App.1981).

This case was more than four years in the trial court from date of filing to the date of the final judgment appealed from. There were more than 20 days of actual trial before the trial judge and the special master. The transcript exceeds 4,000 pages in length. There were large amounts of money and property involved. We are unable to say that the court was in error in the award of attorney's fees and litigation expenses.

### Conclusion

The judgment is reversed and the cause is remanded to the trial court for proceedings in accordance with this opinion including such evidentiary hearings as may be required, and the entry of a new judgment. The new judgment will provide for interest, where applicable, at 9% per annum.

All concur.