**In re MARRIAGE OF Ruth RICKARD and Cliff RICKARD.**

**Ruth RICKARD, Petitioner/Respondent,**

v.

**Cliff RICKARD, Respondent/Appellant.**

No. 17319.

Missouri Court of Appeals,
Southern District,
Division 2.

Oct. 25, 1991.

Motion for Rehearing or Transfer to
Supreme Court Denied
Nov. 15, 1991.

Application to Transfer Denied
Dec. 17, 1991.

See also 721 S.W.2d 781.

H. Lynn Henry, West Plains, for respondent.

David G. Neal, Eminence, for appellant.

MONTGOMERY, Judge.

This case is the continuation of an action for dissolution of marriage between Ruth Rickard and Cliff L. Rickard.[1] Ruth and Leapy were married September 20, 1967, and separated August 21, 1983. On January 12, 1985, the trial court (a) dissolved the marriage of the parties; (b) set apart non-marital property to each party; (c) determined the nature and extent of marital property valued at $340,986, awarding all of it to Leapy; (d) ordered Leapy to pay Ruth $180,000 in cash, for her "interest in the marital property"; (e) ordered Leapy to pay Ruth $500 monthly maintenance and $7,000 as "additional attorney fees." Both parties appealed.

In *Rickard v. Rickard*, 708 S.W.2d 344 (Mo.App.1986), we affirmed that portion of the decree which dissolved the marriage and, in all other respects, the decree was reversed. The case was remanded for retrial on remaining issues because *Hoffmann v. Hoffmann*, 676 S.W.2d 817 (Mo. banc 1984), adopted the "source of funds" rule. *Sumners v. Sumners*, 701 S.W.2d 720 (Mo. banc 1985), held the source of

---

1. Hereafter, we will refer to the parties as noted throughout the record. Respondent is called Ruth and Appellant is called "Leapy"—a sobriquet of unascertained origin.

funds rule applied to a dissolution of marriage action which was tried prior to the publication of the *Hoffmann* opinion and was pending on appeal at the time of that publication. Like *Sumners*, we remanded because the record had not been developed sufficiently to permit application of the source of funds rule.

Retrial of the remaining issues took place on June 27, 1990. On November 16, 1990, the trial court entered its "Findings of Fact, Conclusions of Law, and Judgment."

The judgment of the trial court:

(a) Awarded Leapy all marital property in Petitioner's Exhibit 220 (valued at $2,763,470.60), except a 1978 Chevrolet pickup (valued at $2,000) which was awarded to Ruth;

(b) Ordered Leapy to pay Ruth $500,000 "as her share of the marital property";

(c) Awarded Ruth, as her non-marital property, those items in Petitioner's Exhibit 46 (valued at $1,190);

(d) Awarded Leapy, as his non-marital property, those items in Petitioner's Exhibit 241 (valued at $575,278.26);

(e) Awarded no maintenance to either party;

(f) Ordered Leapy to pay Ruth $25,000 for attorney fees and expenses of litigation;

(g) Taxed costs against Leapy.

Leapy appeals from the judgment of November 16, 1990. His brief presents six assignments of error.

■ In his first point, Leapy maintains the decree is null and void. He reasons that the case was remanded to give the parties an opportunity to develop the record in order to apply the "source of funds" rule in *Hoffmann*. But, prior to trial, § 452.330, RSMo Supp.1989, was revised in 1988 which nullified the source of funds rule. Since the purpose for remand was nullified, the proceedings in the trial court were null and void. We disagree.

In *Rickard, supra,* we affirmed the dissolution of marriage and the remainder of the decree was reversed. Certainly, the reason for the reversal was *Hoffmann, supra.* However, our mandate to the trial court required a decision on the remaining issues such as maintenance, attorney fees, and classification and distribution of property. The decree of November 16, 1990, fulfilled that requirement.

Leapy points us to *Enyeart v. Shelter Mut. Ins. Co.*, 784 S.W.2d 205 (Mo.App. 1989). There the issue was whether the trial court, on remand, followed the appellate decision under the doctrine of law of the case. *Enyeart, supra,* relied on *State ex rel. Curtis v. Broaddus*, 238 Mo. 189, 142 S.W. 340, 342 (Mo.1911), quoting this portion:

'It will be perceived, however, that while this court reserves, as it must, the right to re-examine its former decision in the same case, upon the same state of facts, that right is not accorded to the lower court. If this court makes a mistake, either as to the law or the facts of the case, as may happen, inasmuch as the court is composed of human judges, it has the power—fortunate that it is so—to correct that mistake by reversing itself on a second appeal; but it by no means follows that the trial court or the Court of Appeals has the same right in this regard. On a point, once decided by this court, comes before either the circuit court or the Court of Appeals and further proceedings in the same case, neither of the court's last named has jurisdiction to overrule this court * * *

The same proposition has been recently restated by Judge Shangler of this court in *Davis v. J.C. Nichols Company*, 761 S.W.2d 735, 737 (Mo.App.1988) as follows:

'The initiatives open to a trial court on remand are as rendered in the mandate and opinion of the appellate court [citing]. Where a remand is with directions, a trial court is bound to render judgment in conformity with the mandate [citing]. The trial court is without power to modify, alter, amend or otherwise depart from the appellate judgment. Its proceedings contrary to

the directions of the mandate are "null and void" [citing].'

*Enyeart,* 784 S.W.2d at 208.

Our mandate to the trial court was followed, and its proceedings were not contrary to our direction. Following our directions, a decree was entered after retrial disposing of the remaining issues. Whether *Hoffmann, supra,* was overruled by § 452.330.2(5), RSMo Supp.1989, need not be decided, and we decline to do so. Our duty is to review the case pursuant to Rule 73.01 and *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976), to ensure the trial court properly declared and applied the law. Leapy does not argue that the trial court erroneously declared or applied the law. He states, in effect, that the trial court, after remand, retained a valid decree regarding division of property with only the option to modify or affirm it. He is incorrect, and this point is denied.

■ The next point is that the trial court erred by determining the date for valuation of the property was the date of retrial (June 27, 1990), rather than the date of dissolution of marriage (January 12, 1985). In particular, Leapy claims the parties stipulated to the exact extent and value of all property in the earlier trial which was binding on retrial.

We first discuss the stipulation in the earlier trial. On August 16, 1984, Leapy and Ruth stipulated: [relevant portions]

The parties hereby stipulate and agree that the following items are true, constitute competent evidence, and may be accepted by the court without further proof:

. . . .

2. Parties have submitted separate inventories of marital and non-marital property but agree that the itemization of the property, the designation of the date[s] of acquisition, the purchase price, and the present fair market value[s] are identical. All other entries upon the schedules remain in dispute, particularly whether items are marital or non-marital . . . [and] the extent of the interest each has in the property.

This stipulation was filed the day the first trial commenced.

To support his position, Leapy cites *Edwards v. Hrebec,* 414 S.W.2d 361 (Mo.App. 1967), and *McDonald v. City of Lake Lotawana,* 721 S.W.2d 200 (Mo.App.1986). He quotes from *Edwards, supra:*

A stipulation fairly entered into as to some fact in issue at trial becomes a part of the record and is binding upon the parties and the court upon a subsequent trial of the same action, provided its terms do not limit it to a particular occasion, object or proceeding.

*Edwards* at 366.

First, we believe the stipulation clearly implies a limitation only as to the dissolution proceeding on August 16, 1984. It was filed the day of trial for the particular occasion then before the parties. Secondly, we question the document as being a binding stipulation in the first place. The parties only agreed that their separate inventories and values of property were identical. We read the "stipulation" only as advising the trial court the inventories and values of property were the same and could be accepted into evidence without further proof. We do not agree that a binding agreement arose from the stipulation as required in *Edwards, supra.*

The *McDonald* case only holds that a stipulation dispenses with proof of a matter stipulated, and one who stipulates waives his right to advance a subsequent contention contrary to the stipulated facts. This case is not in point. We hold the stipulation, if any, was not binding on the parties at retrial.

■ A more difficult question under this point is the valuation date of the property. Regardless of the stipulation, Leapy believes the valuation date to be January 12, 1985. We disagree.

Leapy incorrectly asserts in his brief that only two cases in this state consider the correct date for valuation of marital and non-marital property. He cites *Sauer v. Newman,* 666 S.W.2d 811 (Mo.App.1984), and *Hedgecorth v. Hedgecorth,* 696 S.W.2d 862 (Mo.App.1985). He tells us these cases reached opposite results, but we read the cases in harmony.

*Hedgecorth* was a post-dissolution equity proceeding. Wife sought to obtain a portion of her former husband's retirement plan where the settlement agreement and decree failed to mention the retirement plan. The dissolution of marriage decree was entered October 8, 1980, and on July 31, 1982, husband withdrew the total amount of his retirement fund. The trial court divided equally the amount withdrawn on the latter date. The appellate court determined that the wife was entitled to no share of contributions made to the retirement fund by husband after date of dissolution, and an equal division of the retirement plan as of date of dissolution was proper, plus interest earned on her share from date of dissolution to withdrawal date.

*Sauer* was a post-dissolution equitable proceeding to divide the proceeds from the sale of a business which was not distributed in the earlier dissolution action. During the marriage the parties acquired a business by jointly borrowing $40,000. The loan was secured by a deed of trust on a farm which was husband's separate property. The $40,000 was used to pay the entire purchase price of the business. Although the property settlement failed to mention or divide the business, husband agreed to pay all obligations secured by the farm. After dissolution, wife paid monthly installments on the purchase money note for several months. She stopped making installment payments on the note when the business began to lose money. Husband was then forced to make payments or lose his farm. Wife sold the business for $55,000.

After assuming the responsibility to pay the note, husband brought the instant action seeking a division of the proceeds of the sale of the business, and the trial court awarded him a share of the sales price which corresponded to the amount of the debt he assumed.

The court stated:

No Missouri cases have been cited and none have been found in which an appellate court has decided to question whether a marital asset, divided in a separate equitable proceeding brought after a dissolution had been finally adjudicated,

should be valued as of the date of dissolution or as of the later date when the trial court finally divides it between the parties. The facts in the case under review require a finding that the trial court was correct in valuing the ... business at the $55,000.00 sale price because the business remained marital property until it was sold, not having been distributed in the earlier dissolution action. Because the business was marital property when sold, the sale proceeds were marital property....

*Sauer,* 666 S.W.2d at 814–815.

The retirement plan in *Hedgecorth* was increased after dissolution only by husband's contributions from his non-marital income. Clearly, wife should have no claim to an asset increased in value by the post-dissolution income of the former spouse. On the other hand, *Sauer* involved the sale of the business where husband was obligated to expend funds to protect his separate property from loss. We believe both cases reached the right result and are in accord.

Our court cited *Sauer,* with approval, in *Grunden v. Nelson,* 793 S.W.2d 569 (Mo. App.1990). In this equitable action (filed in 1988), the husband sought an order of the trial court awarding him full ownership of real estate which was not distributed by a decree in 1977.

We held:

This court agrees with the wife's contention that the trial court erred in using 1977 real estate values as the basis for equitable division of sale proceeds derived from the 1989 sale of the real estate.... In *Sauer v. Newman,* 666 S.W.2d 811, 815 (Mo.App.1984), the court held that an asset which had been a marital asset and was later divided in a separate equitable proceeding, brought after dissolution had been finally adjudicated, was properly valued as of the later date when the trial court finally divided the property between the parties rather than value it as of the date of divorce. *No Missouri cases are found which are in conflict with that principle.* [Emphasis supplied.]

*Id.* at 572.

We find no Missouri cases which support Leapy's position. To the contrary, we find

only Missouri cases which point to the trial date as the proper date of valuation.

Leapy relies on several Illinois cases such as *In re Marriage of Rossi*, 113 Ill. App.3d 55, 68 Ill.Dec. 801, 446 N.E.2d 1198 (1 Dist.1983), and *In re Marriage of Brooks*, 138 Ill.App.3d 252, 93 Ill.Dec. 166, 486 N.E.2d 267 (1 Dist.1985). We are not persuaded by these cases because Illinois has a specific statute covering the question before us.

Ill.Ann.Stat. ch. 40, ¶ 503(h) (Smith–Hurd 1984), states:

Unless specifically directed by a reviewing court, the court shall not on remand consider any increase or decrease in the value of any 'marital' or 'non-marital' property occurring since the assessment of such property at the original trial or hearing, but shall use only that assessment made at the original trial or hearing.

The above statute became law January 1, 1984, as a result of the *Rossi* decision. *Brooks* was decided after January 1, 1984. Missouri has no similar statute to guide us on the proper valuation date.

We believe the *Sauer* case applies here because of the ability of the trial court to consider contributions made by the parties after the original decree of dissolution.

The *Sauer* court stated:

The trial court was entitled to hear evidence about the interest of the husband in [business] which was marital property. § 452.330, RSMo.1978 (1982 Cum.Supp.). The law includes the contribution of a spouse as a factor to consider in the division of marital property. Evidence of the parties' contributions to the enterprise was admissible. § 452.330.-1(1), RSMo.1978 (1982 Cum.Supp).

*Id.* at 814.

By considering contributions of both parties to the enterprise after dissolution, the trial court is able to determine a fair division of any undivided property. Certainly, cases may arise where undivided property may have depreciated in value, and fairness dictates that parties should share in the risk of loss or gain after a consideration of their contributions to the undivided marital property.

Leapy seems to take the position that he is entitled to all increases in the value of marital property after dissolution simply because it was in his possession. We find no rational basis in that position, and point two is denied.

The essence of Leapy's third point is error by the trial court in finding Ozark Gas Company to be marital property. He further asserts that assets acquired after the marriage by Ozark Gas Company, including Ozark Distributing Company, only represented "increase in value of non-marital property." For the reasons which follow, this point is denied.

To answer this point, certain findings of the trial court are necessary to set forth: [relevant portions]

At the time of her marriage to Leapy, Ruth was forty-two years old. She had no formal education or training beyond the tenth grade, and her only work experience had been at what is commonly termed 'unskilled labor.' At the time of her marriage she worked as a 'hostess' at the Holiday Inn in West Plains. Ruth brought relatively little property into the marriage.

At the time of this marriage Leapy was a few years older than Ruth, and like her, he had no formal training beyond high school. In September of 1967 he was a partner with George King in Ozark Gas Company, a successful and growing concern started by the two men in 1951. They started Ozark Gas for the purpose of distributing propane gas in the West Plains area, and later, expanded it to Willow Springs and Thayer. In the early years of the partnership, Leapy and Mr. King worked hard, long hours at the business doing all manner of labor, including the delivery of gas. As the business prospered and grew they were able to hire employees to do the labor and a dependable manager to attend to the day to day running of the business. This freed Leapy to pursue other activities including golf, bridge, and the work on his farm. At the time Leapy's divorce of his first wife on September 30, 1965 the value of his capital account in Ozark

Gas was $98,853.11, which included $38,-000 in real estate which he owned in partnership with George King.

. . . .

The primary purpose of Ozark Gas was to sell propane gas to its customers in West Plains, Willow Springs, and Thayer. This business had always prospered, but due to many factors including the general economic conditions in the area, the business accellerated [sic] after 1967. The partnership began to reinvest its profits in new equipment and property. Leapy and his partner also made investments in real estate from the partnership profits, some of which were related to the gas business and some of which were not.

In January of 1967 the partners purchased the Graham/Vandertook property, but they did not pay the purchase price of $40,000 until after the marriage to Ruth. The present market value of the Rickard portion of this property is $52,000.

Leapy and Mr. King purchased the Willis Lee property in March of 1972. [T]he present market value of the Rickard portion is $31,116.

They purchased the Faddis property in September of 1972. The present value of the Rickard portion of this property is $18,463.35.

They purchased the Carr Ward propery [sic] in October of 1972. [T]he value of the Rickard portion is $3200.

In October of 1973 they purchased the Burchard property. The value of the Rickard portion is $1860.

In August of 1973, Leapy and Mr. King purchased the warehouse property from Wayhaven, Inc. They purchased this property as part of the plan to acquire and operate a beer and wine distributing business discussed below. The value of the Rickard portion of this property is $164,717.76

The partners acquired the Ozark Television property in August of 1973 and the present value of the Rickard portion is $10,000.

The[y] purchased the Alford property in 1971, and the present value of the Rickard share is $500.

All of the tracts of property listed above were titled to C.L. Rickard and George King, and all were purchased with funds from the partnership account.

In 1973, Leapy and Mr. King purchased a beer and wine distributing business from Mr. Corbett Sims for approximately $180,000. The partners furnished part of the purchase price in the form of a note in the amount of $163,000 executed by C.L. Rickard and Ruth Rickard with Mr. and Mrs. King. This was a seperate [sic] partnership from Ozark Gas with seperate [sic] accounting, seperate [sic] employees, seperate [sic] management, and a different federal tax identification number from the older partnership. From the testimony of Mr. King and from Mr. Rickard, it was apparent that Mr. King is the more knowledgable [sic] and competent as to the operations of their partnership interests. According to Mr. King, Ozark Distributing, although not as profitable as Ozark Gas, generated sufficient profits to retire the note to Mr. Sims, to expand, and to purchase additional assets. It virtually paid for itself. The partners sold this business in June of 1988 for $613,070.88 yielding a Rickard share of $306,535.45.

. . . .

As indicated above, at the time of his marriage to Ruth Leapy's capital account in Ozark Gas less the real estate was approximately $71,000. From this, his account has grown to $874,986 as of date of this retrial. This appreciation in the value of Ozark Gas is due to several factors. First of all, by 1967 the business was a successful and growing concern, able to take advantage of general economic conditions which developed during the marriage. Also, the partners did not draw from the business as much as they could have, choosing instead to reinvest profits and build up assets. Further, the skill and knowledge of the owners contributed. It is obvious that by the time of his marriage to Ruth, Leapy's interest in Ozark Gas did not require forty hours per week of his attention. A trustworthy and competent manager looked after the day to day operation of

selling and delivering propane gas. However, Leapy did go to the office almost every day during the morning hours, and the Court concludes that the skill and knowledge he developed over his many years in the gas business contributed to the appreciation of Ozark Gas.

All of Leapy's financial affairs were handled from one parnership [sic] bank account managed from the office of Ozark Gas. Leapy took his draws on the partnership from this account. If he received funds from any source he deposited them in this account. He placed income from his farm in this account, and when he had ... farm expenses he paid them from this account. Leapy ran all of his affairs, whether business or personal, through the partnership bank account. The Ozark Gas accountant kept a 'draw account' for each partner and was able to segregate Leapy's personal transactions from those of the business and to account for them seperately [sic], although all flowed through the one account. This procedure freed Leapy and Mr. King from bookkeeping and allowed the accountant to track the partners' financial affairs from the one account.

. . . .

The Rickards enjoyed a relatively luxurious lifestyle for the West Plains area. Leapy drew a large income from Ozark Gas which averaged well over $100,000 per year during the last five years of the marriage. Ruth and Leapy took vacations to foreign countries and to destinations in this country as well. They lived in a relatively new and well furnished home lacking nothing to live comfortably. Leapy was able to spend his afternoons playing golf or bridge with his friends and many of his evenings entertaining himself in the local lounges.

Conclusions of law, relative to Ozark Gas Company and Ozark Distributing Company, are:

1. Marital property is defined by 452.-330.2 R.S.Mo. as all property acquired by either spouse subsequent to the marriage, unless it fits one of the four categories of exceptions. Further, all property acquired subsequent to the marriage is presumed to be marital. 452.-330.3 R.S.Mo.

Ozark Gas was a partnership and not a corporation. (The partners incorporated the business sometime after the dissolution of the marriage in 1984.) As the profits were generated they were income of the partners, and the partners could choose whether to reinvest the profits in the assets of the business or draw them for their personal needs. Leapy and his partner George King reinvested some of their profits in assets which promoted the growth of the business of selling gas. They also invested profits in some assets unrelated to the gas business. Of course, each drew profits from the business for his personal needs. Leapy argues he acquired his interest in the business before the marriage, and that although it has increased in value during the marriage through reinvestment of profits, it has retained its non-marital character. He cites several cases in support of his position, and he refers to the appreciation of Ozark Gas in terms of 'retained earnings.' The cases cited involve appreciation in the value of corporations, and 'retained earnings' is a term used in accounting for corporations. A corporation can be a different creature from a partnership as regards when and how assets are attributable to its owners. In fact, in *Heineman v. Heineman,* 768 S.W.2d 130 (Mo.App.1989), a case cited by the Respondent, the Court states at page 137:

'If the business had remained unincorporated all the profits thereof would have constituted earnings to the wife and would have constituted marital property.'

In this case there was no corporation and the profits from Ozark Gas became the income of Leapy as they were earned by the partnership. Although Leapy's interest in the partnership was originally nonmarital, income from Ozark Gas became marital, and the assets acquired with this income became marital property. Therefore, over time Leapy's interest in the partnership became marital as he and Mr. King applied more and more of

Leapy's marital income to the acquisition of assets.

This analysis does not make allowance for the value of Leapy's share at the time of his marriage to Ruth. There is no evidence on which the Court could base a computation to give him credit for a non-marital portion against the entire value of his interest. So, the Court chooses not to assign some arbitrary value but simply to consider Leapy's interest in Ozark Gas to be marital property and to divide the marital property with consideration of the fact that Leapy is the source of this valuable asset, which is in turn the source of virtually all of this couple's considerable property.

Ozark Distributing was acquired during the marriage with funds generated from within. There being no evidence to rebut the presumption in favor of marital property, the court finds Leapy's interest in this to be marital property.

We observe Petitioner's Exhibit 220 values Ozark Gas Company at $1,749,973, with Leapy's one-half share at $874,986. The same exhibit reflected the sales price of Ozark Distributing Company at $613,070.88, with Leapy's one-half share being $306,535.45.

The total value of marital property awarded to Leapy amounted to $2,763,470.60, except a 1978 Chevrolet pickup to Ruth valued at $2,000. Leapy's marital property award was a net of $2,761,470.60. His non-marital property award (Petitioner's Exhibit 241) was $575,278.26.

In contrast, Ruth was awarded $500,000 "as her share of marital property" plus the $2,000 Chevrolet pickup, for a total of $502,000. Her non-marital property award (Petitioner's Exhibit 46) was $1,190.

Assuming, without deciding, the trial court erred in characterizing Ozark Gas Company in its entirety as marital property, the value of one-half share of Ozark Gas Company ($874,986) should be deducted from Leapy's marital property award. This calculation reveals Leapy would receive marital property with a value of $1,886,484.60. His non-marital property award would increase from $575,278.26 to $1,450,264.26.

Leapy's payment to Ruth of $500,000 from his marital property of $1,886,484.60 is a division of 73.5 percent to him and 26.5 percent to Ruth. Such division of marital property is far from unfair to Leapy especially in view of his substantial amount of non-marital property. Frankly, on the division shown, it appears that the wrong party complains.

■ The primary concern of this court is the correctness of the result and not the route by which it is reached. If the result could have been reached by any reasonable theory, the judgment will be affirmed. *Walker v. Walker,* 631 S.W.2d 68, 71 (Mo. App.1982).

In *Walker,* the appellant argued the distribution of property was unjust. The trial court erroneously determined three assets were non-marital property when clearly they were marital property. Appellant was awarded one asset as non-marital property and respondent the remainder.

The court said:

Therefore, if the $10,000 retirement account is added to appellant's other marital property and the cash value of the life insurance and the $900 bank account is added to respondent's share of the marital property, this court could not say that the distribution of marital property is unjust.

*Id.* at 71.

See *P.A.W. v. A.M.W.,* 716 S.W.2d 284, 287 (Mo.App.1986); *Morgan v. Morgan,* 755 S.W.2d 737, 740 (Mo.App.1988).

The trial court in a dissolution proceeding is not required to make an equal distribution of the marital property. It is only required that the distribution be fair and equitable. *D'Aquila v. D'Aquila,* 715 S.W.2d 318 (Mo.App.1986). We hold that Leapy received a fair and equitable distribution of marital property even if Ozark Gas Company was erroneously determined to be marital property.

■ We turn to Leapy's complaint that Ozark Distributing Company and various tracts of real estate were all erroneously determined to be marital property. As reflected by Petitioner's Exhibit 220, Ozark

Distributing Company was sold in 1988 for $613,070.88, of which Leapy's share was $306,535.45. Ozark Distributing Company was purchased by Leapy and George King after Leapy's marriage to Ruth. George King testified $163,000 was borrowed to finance the purchase. He stated that he and his wife with Leapy and Ruth executed a note for $163,000 secured by a deed of trust for the purchase. His testimony indicated that Ozark Distributing Company generated adequate income to pay for the full purchase price. Finally, he related that Ozark Distributing Company maintained a completely separate set of books and was a completely separate entity from the propane business (Ozark Gas Company). His testimony was uncontradicted.

The findings of the trial court indicate the various tracts of real estate (except the Graham–Vandertook property)[2] were purchased after the marriage of the parties. The real estate was titled in the name of Leapy and George King, and the funds for each purchase came from the Ozark Gas partnership account.

Leo Sheridan, accountant for Ozark Gas Company, testified that Leapy and George King had complete access to the partnership bank account of Ozark Gas Company. Both partners would write checks on the partnership account which were charged to the draw of each partner. He stated both partners could draw from the partnership account but, using common sense, each would leave enough for the business to operate. His testimony was uncontradicted.

From this setting Leapy argues that because the funds came from the partnership account at Ozark Gas Company, the real estate purchased was non-marital property. He believes that the real estate was merely an increase in value of the non-marital entity, Ozark Gas Company. We disagree and hold that both Ozark Distributing Company and the various tracts of real estate are marital property.

Our dissolution statutes create a legal presumption that property acquired subse-

quent to the marriage is marital property. § 452.330.3 (RSMo Supp.1990).[3] The presumption of marital property is overcome by a showing that the property was acquired by a method listed in § 452.330.2. Leapy has the burden to rebut the statutory presumption in regard to Ozark Distributing Company and the various tracts of real estate. *McDowell v. McDowell*, 670 S.W.2d 518, 523 (Mo.App.1984); *Fields v. Fields*, 643 S.W.2d 611, 614 (Mo.App.1982).

Ozark Distributing Company was purchased after the marriage with borrowed funds, and thereafter the business generated sufficient profits to retire the debt. Leapy fails to overcome the statutory presumption under any exception in 452.330.2. Certainly, the beer and wine distributing business was not an increase in the value of Ozark Gas Company. It was simply a separate venture entered into by two people who also happened to be partners in an existing business.

■ The same scenario exists with regard to the various tracts of real estate. Each tract (except one) was purchased after the marriage. Although the funds came from Ozark Gas Company, the partners were entitled to draw funds anytime from the partnership account. Each partner was charged with the draw in accounting for money taken from the partnership account. The record only indicates the partners were investing in real estate with funds available to them from the partnership account. Title was taken in their individual names, not in Ozark Gas Company, a partnership. The real estate was not an increase in the value of Ozark Gas Company.

We view the funds taken from the partnership account for purchase of real estate as income to Leapy. Even if Ozark Gas Company is totally a non-marital asset, the funds withdrawn are marital property.

*Heineman v. Heineman*, 768 S.W.2d 130 (Mo.App.1989), concerned the characterization of retained earnings in wife's corporation. At the time of marriage wife's

---

**2.** The trial court found the entire purchase price of this property was paid after the marriage (presumably from marital funds).

**3.** All statutory references are RSMo Supp.1990 unless otherwise indicated.

business was a sole proprietorship, and after marriage the business was incorporated. Wife then took no salary from the corporation, and the retained earnings accumulated to $128,063. The trial court held the retained earnings represented an increase in the value of the premarital business and therefore were non-marital property.

The appellate court disagreed, stating:

We hold however that the retained earnings did not represent an increase in the value of the premarital studio. The corporation did not exist at the time of marriage, it came into being after the marriage. The retained earnings account was accumulated from money which otherwise would have been paid to wife as her salary. If the business had remained unincorporated all the profits thereof would have constituted earnings to the wife and would have constituted marital property.

*Id.* at 137.

Leapy and his partner only took profits from their partnership account since they always used common sense and left enough for the business to operate. As in *Heineman*, profits from non-marital property constitute marital property. See *Wilhelm v. Wilhelm*, 688 S.W.2d 381 (Mo.App.1985), where rental income from inherited real estate was found to be marital property.

Leapy's fourth point avers the trial court erred in finding $184,000 worth of marital contributions and improvements were made to Leapy's non-marital farm. He again contends the stipulation of the parties in the earlier trial on the value of marital improvements was binding on the trial court.

We have answered, adverse to Leapy, this same contention on the parties' stipulation under his second point. No further discussion is necessary here.

▉ Under this same point, Leapy complains of the finding by the trial court that $40,000 of marital funds was expended constructing a home on the non-marital farm. He states the exhibits prove only $33,000 was spent. The $40,000 sum makes up a portion of the $184,000 amount.

Leapy overlooks his own testimony which was obviously believed by the trial court. Ruth introduced, without objection, portions of Leapy's deposition testimony as admissions against interest.

His testimony was:

Q. There have been substantial improvements made to the 320–acre tract; is that correct?

A. Yes.

Q. You built a home which you say you put in about $40,000 into that?

A. Yes.

When determining the sufficiency of the evidence, an appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial court's decree and disregard all contrary evidence. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989). In the instant case, substantial evidence supports the finding of the trial court on cost of the home. Point four is without merit.

In point five, Leapy quarrels with the award of $500,000 to Ruth as her division of marital property. He emphasizes this is a childless second marriage, Ruth's contributions to the marital estate were negligible, and Leapy provided all the income from his non-marital business to acquire considerable marital property and provide a high standard of living.

Again, we have decided under point three the division of property is fair and equitable. Point denied.

▉ Finally, the last point of error urges that the trial court was incorrect in finding $65,000 paid to Ruth by Leapy during the pendency of this case was temporary maintenance rather than an advancement against her share of the property division. We disagree.

Shortly after separation and until after the second trial, Leapy paid Ruth varying lump sums of money totaling $65,000. Ruth had filed a motion for temporary maintenance on September 16, 1983. Rather than take up the motion, the parties stipulated that each payment was received by Ruth as temporary maintenance but paid by Leapy as an advancement against

Ruth's share of marital property, the determination of which was left to the trial court.

Leapy cites *Drikow v. Drikow*, 803 S.W.2d 122 (Mo.App.1990), for the proposition that maintenance to wife is improper when the interest income from her cash award and her employment income is sufficient to meet her reasonable needs. *Drikow* is not in point since that case involved a permanent award of maintenance.

In the instant case, Ruth is yet to receive a cash award to provide interest income. Her dispute with Leapy has been pending since September 16, 1983. By the stipulation of the parties the trial court could only find the payments to be temporary maintenance or an advancement against marital property. Payment of $65,000 to Ruth over the last eight years amounts to $8,125 yearly. Ruth is now 66 years of age with only unskilled work experience, was not employed during the marriage, and has been employed during separation as a housekeeper at $53 weekly gross wage. In view of Leapy's very substantial income over the same period of time, no abuse of discretion is found in the determination of the trial court. See *Murphy v. Carron*, *supra*.

Ruth filed a motion to dismiss Leapy's brief for failure to set forth a fair and concise statement of facts. Rule 84.04(c). Leapy did not present us with a model statement of facts, but the argument portion of his brief was clear with concise facts relevant to his position. Ruth's motion was taken with the case and is now overruled.

Judgment affirmed.

SHRUM, P.J., and MAUS, J., concur.